**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Criminal No. 16-40 |
| | ) | Judge Nora Barry Fischer |
| MICHAEL OLIVER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court are Defendant Michael Oliver's Motion for Revocation of Detention Order, his supporting Memorandum, the Government's opposition thereto, and Defendant's reply. (Docket Nos. 25, 29, 33, 39). Defendant was ordered detained at the conclusion of a detention hearing before U.S. Magistrate Judge Robert C. Mitchell on March 3, 2016. (Docket Nos. 19, 29-2). Defendant seeks *de novo* review of the Order of Pretrial Detention and asks this Court to reverse Magistrate Judge Mitchell's order and release him on bond with strict conditions including home confinement and electronic monitoring. (Docket Nos. 25, 29, 33). Defendant's Motion is granted to the extent that this Court has undertaken a *de novo* review of the Order of Pretrial Detention and considered the transcript of the proceedings before Magistrate Judge Mitchell and the evidence presented at that time, including the Bond Report produced by Pretrial Services. (Docket No. 29-2). However, after careful consideration of the parties' arguments and all of the evidence of record, Defendant's Motion is denied to the extent that he seeks reversal of the Order on Pretrial Detention and release on bail. Defendant's Motion is likewise denied insofar as he requests a hearing, which this Court finds is unnecessary because the record was fully developed before Magistrate Judge Mitchell and the Court has considered all of the additional materials that have been added to the record at this stage.

## II.  BACKGROUND

Defendant is the lone individual charged in a multi-count Indictment with, among other offenses, conspiracy to distribute and possess with intent to distribute significant amounts of heroin and cocaine.  (Docket No. 1).  Specifically, Defendant is charged with:

- one count of conspiracy to distribute and possess with intent to distribute more than 1 kilogram of heroin and 5 kilograms or more of cocaine, from in and around January 2013 to in and around December 2015, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(A)(ii), and 846 (Count 1);
- two counts of possession with intent to distribute and distribution of 5 kilograms or more of cocaine in and around November, 2015 (Count 2); and January 14, 2016 (Count 3), in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(ii);
- one count of possession with intent to distribute 100 grams or more of heroin and a quantity and mixture of cocaine on January 14, 2016 (Count 4), in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(B)(i), and 841(b)(1)(C); and,
- one count of possession of firearms (i.e., a 9 millimeter semiautomatic Smith & Wesson pistol and a 9 millimeter Glock pistol), in furtherance of drug trafficking crimes on January 14, 2016, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

The potential penalties for such violations include a sentence of not less than ten years' imprisonment and up to a term of life imprisonment at each of Counts 1, 2 and 3, *see* 21 U.S.C. § 841(b)(1)(A)(ii); a term of imprisonment of not less than five years and up to 40 years at Count 4, *see* 21 U.S.C. § 841(b)(1)(B)(i); and, a mandatory consecutive term of imprisonment of five years at Count 5, *see* 18 U.S.C. § 924(c)(1)(A)(i).

No witnesses testified at the detention hearing and both sides proceeded by proffer, without any objections.  (Docket No. 29-2).  Indeed, Defendant declined the Government's offer to cross-examine the affiant and case agent, Pennsylvania State Police Trooper Justin Duvall, who was present at the hearing.  (Docket No. 29-2 at 5, 14-15).

The uncontested facts reveal that this case is the result of a Pennsylvania State Police investigation into interstate drug trafficking that was initiated upon the traffic stop of an individual that has a prior federal drug trafficking conviction and became a confidential informant, ("CI"), working with law enforcement to build a case against Defendant. (*3/3/16 Hr'g Trans.*, Docket No. 29-2 at 6; Docket No. 29 at ¶ 1). During the traffic stop, the CI was found in possession of 11 kilograms of cocaine. (Docket No. 29-2 at 6). He told the State Troopers that he supplied cocaine to Defendant in Pittsburgh, including a recent 45-kilogram shipment to Defendant in November of 2015 for which Defendant still owed him hundreds of thousands of dollars. (*Id.*). The CI agreed to cooperate with law enforcement and to wear a wire and other equipment to take audio and video recordings of his interactions with Defendant. (*Id.*). Outfitted with this equipment, the CI collected $250,080 from Defendant at an apartment on Smallman Street in the Strip District on December 9, 2015. (*Id.*). Two days later, he collected an additional $79,885.00 from Defendant in Monroeville, recording these interactions as well. (*Id.*). The recordings also captured the CI and Defendant discussing the terms of the next shipment of cocaine which was to take place in January of 2016. (*Id.*). The terms were such that the CI offered Defendant a significant price break if he prepaid for the next shipment, (i.e., $27,000 per kilogram versus $32,000). (*Id.* at 6-7). Defendant then paid the CI an additional $330,000 to secure the January shipment of 50 kilograms of cocaine. (*Id.*). There were a number of phone calls between Defendant and the CI leading up to the January deal that were also recorded. (*Id.* at 7-8).

The drug deal was set up to take place at the same Smallman Street apartment where the pair had exchanged cash in December of 2015. (Docket No. 29-2 at 9). In preparation for same, the CI was once again outfitted with the surveillance equipment and provided with a suitcase

filled with 4 kilograms of real cocaine and 46 kilograms of sham cocaine by the State Police. (*Id.* at 9). The video and audio recordings captured the interactions between Defendant and the CI during the deal on January 14, 2016. (*Id.* at 9). Defendant met the CI in the lobby of the apartment building. (*Id.*). Defendant was carrying a backpack. (*Id.*). The CI had the suitcase, which he was wheeling around. (*Id.*). In the elevator, the CI tells Defendant that he has "50," (meaning kilos of cocaine), and that he can supply Defendant with more in the future. (*Id.*).

The scene moves into the apartment with Defendant leading the CI into the bedroom. (Docket No. 29-2 at 10). The CI opens the suitcase to show Defendant the drugs, telling him again he has "50." (*Id.*). Defendant takes cash out of the backpack and stacks it into different piles on the bed. (*Id.*). They interact for around 15 minutes until the police arrive and arrest Defendant. (*Id.* at 10). Upon his arrest, law enforcement retrieved the drugs, seized the cash from the bed and bag, (around $300,000), and a semiautomatic pistol from Defendant's waistband. (*Id.* at 10-11, 24). Another firearm was located in the bag that he was carrying and contained the money. (*Id.* at 10-11). (Both firearms were registered to Defendant and he held permits for same.). (*Id.* at 16-17). A cocaine press was found in the closet of the same bedroom where the deal was to take place. (*Id.* at 11). The officers searched the remaining parts of the apartment and found more than 10,000 stamp bags of heroin in the closet of another bedroom. (*Id.* at 12). All of this evidence was photographed and seized. (*Id.* at 10-13).

Defendant was arrested on the scene and detained. (Docket Nos. 29 at ¶ 2; 29-2 at 10). He was charged in state court with drug trafficking charges, made bail, and was released on January 15, 2016. (Docket No. 29 at ¶ 2). Defendant initially retained local attorney Fred Rabner, Esquire to represent him. (Docket No. 29-2 at 18-19). Mr. Rabner had numerous contacts with Trooper Duvall and was advised that his client had been indicted by a federal grand

jury on March 1, 2016. (*Id.*). Mr. Rabner made arrangements to have Defendant turn himself in to federal authorities and he did so without incident. (*Id.*). Defendant also had no issues while on state bond between January 15, 2016 and March 2, 2016, the day that he turned himself into federal authorities. (*Id.*). It appears that the parties agree that a federal grand jury has not announced any federal charges against the CI from his supply of narcotics to Defendant and that this individual is not incarcerated at this time. (Docket Nos. 29, 33, 39).

Magistrate Judge Mitchell and the parties also had the benefit of the Pretrial Bond Report produced by the U.S. Probation Office after interviewing Defendant and to which no objections were lodged at the hearing. (*See Bond Report dated 3/2/16*; Docket No. 29-2). This report reveals that Defendant: is now 42 years old; is a high school graduate; worked for the past 6 years at New Millennium Auto Sales in Verona, Pennsylvania, where he worked 40 hours per week earning around $2,250.00 per month. (*See Bond Report dated 3/2/16*). As to family ties, Defendant married his longtime girlfriend Sameika Oliver, in February of 2016. (*Id.*). She works outside the home as a clinical support specialist at a local hospital earning approximately $1,900 per month. (*See Bond Report dated 3/2/16*; Docket No. 29 at ¶ 15). She has been on leave from this position recently but is scheduled to return in June of 2016. (Docket No. 29 at ¶ 15). The couple has two minor children who live with them at their home near Wilkins Township.[1] (*See Bond Report 3/2/16*). Defendant has three other children from a prior relationship: a minor daughter; an adult son; and an adult daughter. (*Id.*). None of these children live with Defendant, although they live in the Pittsburgh area. (*Id.*). His adult son suffers from Down's syndrome and Defendant provides unspecified assistance with his care. (Docket No. 29-2 at 16).

---

[1]    In addition to the home, Defendant also maintained the apartment on Smallman Street in the Strip District. (Docket Nos. 29-2 at 10; 33 at 6-8).

Defendant has no prior criminal convictions. (*See Bond Report 3/2/16*). He has prior arrests for: carrying a firearm without a license in 1993 at age 19, disposition unknown; and a cocaine trafficking charge from 1995 when he was 21 years old issued by the DEA in Florida that was dismissed for "insufficient evidence." (*Id.*). As noted, Defendant was the licensed owner of two firearms. Previously, in May of 2015, Defendant was stopped at the airport with a loaded 9 millimeter Glock firearm in a bag he was attempting to carry on a plane. (*Id.* at 24). The police report noted that he was also in possession of $20,000 in cash and several Gucci watches. (*Id.*). The firearm, ammunition, magazine, and holster were seized by law enforcement.[2] (Docket No. 33-13). Defendant told the officer that he had a permit for the firearm and was carrying so much cash because he was the owner of New Millennium Auto Sales. (*Id.*). As the weapon was seized by authorities, Defendant was then permitted to go on his way to Miami, Florida where he told law enforcement he was traveling to "have a good time." (*Id.*). The Bond Report further advises that Defendant held a United States passport and traveled internationally in the recent past, vacationing in Turkey in 2010 and Africa in 2015. (*See Bond Report 3/2/16*).

It is uncontested that Defendant's home was burglarized in November or December of 2015. (Docket Nos. 33, 39). The circumstances of the burglary are unclear although it appears that Defendant's wife contacted the police and they were unable to identify the individuals who perpetrated the offense. (Docket No. 39 at ¶ 4). Defendant and the CI discussed the burglary to some degree during recorded conversations in December of 2015 and January of 2016. These conversations reveal that Defendant was not at home at the time of the robbery and that he

---

[2] According to an April 18, 2016 news article presented by Defendant, "TSA screeners at Pittsburgh International find unloaded gun in woman's carry-on" published on Triblive.com by the Pittsburgh Tribune Review, TSA screeners found 20 firearms at security checkpoints in 2015; 14 in 2014; and 5 so far in 2016. (*See Def. Ex. D, Docket No. 39-2*). This article does not specify how many travelers proceed through check-points at Pittsburgh International Airport on an annual basis.

believed that the burglars knew that he was not at the home.  (Docket Nos. 33-2; 39-1).  His wife believed that someone was following her as she was driving.  (*Id.*).  The burglars apparently did not find what they were looking for in the home, leading to an exchange concerning Defendant's carrying of firearms.  (Docket No. 39-1 at 2).  To this end, Defendant commented to the CI that "People already know I carry a gun anyway. So they just not gonna run up and grab me. Ain't nobody gonna want to get close to me cuz I got a gun in my thing. Gun in here…"  (*Id.*).  The parties dispute the import of these conversations with the Government arguing that they represent a threat toward the unknown robbers while Defendant suggests that he was merely commenting on his ability to protect himself and his home from this type of invasion in the future. (Docket Nos. 29, 33, 39).  The Bond Report also reveals that Defendant's wife maintains a revolver in the home that she keeps for personal protection but adds that she had agreed to remove it from the home if her husband was released.  (*Bond Report 3/2/16*).

At the detention hearing, the attorneys argued their respective positions to Magistrate Judge Mitchell, who held that Defendant would be detained pending trial, thereby rejecting Defendant's proposal that he be released on bond to reside at home with his wife and children during pretrial proceedings and trial.  (Docket No. 29-2).  In the detention Order, Magistrate Judge Mitchell held the following:

> I find that the testimony and information submitted at the detention hearing establishes by clear and convincing evidence that:
>
> Probable cause found based on indictment of grand jury and evidence presented here. Confidential informant recorded recovering proceeds of drug sales from defendant in excess of $300,000.00 and prepayment of another $300,000.00 as well as a recorded delivery of 50 kilograms of cocaine. Confidential informant discussed coming shipments of cocaine with defendant. Upon conviction, defendant faces a substantial mandatory sentence of up to life imprisonment. Defendant possessed a firearm during

the drug transaction and appears to carry firearms. Defendant has employment and family ties to this community. The defendant is licensed to carry firearms. Defendant surrendered when he became aware of federal charges. The statutory presumption has not been rebutted. Held without bail.

(Docket No. 19 at 2).

Subsequent to the detention hearing, at the request of defense counsel, Pretrial Services evaluated the suitability of both Defendant's wife, Sameika, and his mother, Claraine Oliver, to be third party custodians for Defendant and concluded that both meet the necessary requirements. (Docket No. 29 at ¶ 15). At this stage of the proceedings, Defendant proposes that he be released on a $50,000.00 unsecured appearance bond and subject to electronic monitoring and home detention at their home near Wilkins Township. (*Id.*). He asks that his wife serve as the primary third party custodian and that his mother serve as her alternate in this role. (*Id.*). According to the Bond Report, Defendant's mother resides in Penn Hills. (*Bond Report 3/2/16*).

Defendant filed the pending Motion on April 1, 2016, (Docket No. 25), and submitted his supporting Brief and evidence under seal[3] on April 5, 2016, (Docket No. 29). The Government filed its Response in opposition on April 12, 2016, also under seal. (Docket No. 33). The Court ordered Defendant to file a Reply, which he did, under seal, on April 26, 2016. (Docket No. 39). No further briefing has been submitted. Accordingly, Defendant's Motion is now ripe for disposition.

III. LEGAL STANDARD

A District Judge reviews the decision of the U.S. Magistrate Judge granting or denying bail *de novo*. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). The Court retains the discretion to make its determination after reviewing the record developed before the U.S.

---

[3]     The parties were granted leave of court to make all of these submissions under seal given the protective order that was issued by the Honorable Gustave Diamond on March 9, 2016. (Docket No. 23). The case was subsequently reassigned to this Court on April 5, 2016 but that order remains in place.

Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record. *See e.g.,* 18 U.S.C. § 3142(f)(2)(B); *United States v. Burgess*, Crim. No. 09-150, 2009 WL 2038148, at *2 (W.D. Pa. Jul. 9, 2009). However, when the record is fully developed below, and the parties have not proffered any additional evidence which would materially alter the decision of the Magistrate Judge, as is the case here, the Court will rule on the record established before the Magistrate Judge. *See e.g., United States v. Ewell*, Crim. No. 13-125, 2013 WL 4479029, at *1 (W.D. Pa. Aug. 20, 2013); *United States v. Atkins*, Crim. No. 15-87, 2015 WL 4920831, at *3 (W.D. Pa. Aug. 15, 2015).

## IV. DISCUSSION

The parties do not dispute Magistrate Judge Mitchell's finding that a rebuttable presumption of detention arises in this case given the grand jury's return of an Indictment setting forth several charges against Defendant for which the maximum possible sentence is life imprisonment, (i.e., Counts 1-3), and several violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, (i.e., Counts 1-4), for which the authorized statutory penalty exceeds a term of incarceration of more than 10 years. (Docket Nos. 25, 29, 33, 39). The grand jury's return of the Indictment suffices to demonstrate probable cause that these offenses were committed. S*ee United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986). The potential penalties for the violations at each of Counts 1-3 includes a statutory minimum sentence of 10 years and up to a term of life imprisonment. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(A)(ii), 846. Defendant also faces potential penalties of at least 5 years and up to 40 years at Count 4, 21 U.S.C. § 841(b)(1)(B)(i); and a mandatory consecutive penalty of 5 years, if convicted of Count 5. (Docket Nos. 1, 2). Hence, upon convictions of all of these offenses, as charged, Defendant would be subject to at least 15 years of mandatory minimum penalties and up to a term of life

imprisonment. If all of the sentences were imposed consecutively, *see* 18 U.S.C. § 3584, Defendant would face a mandatory period of incarceration of at least 40 years. Therefore, pursuant to 18 U.S.C. § 3142(e)(3), a rebuttable presumption has been established that no condition or combination of conditions will reasonably assure the appearance of Defendant as required and reasonably assure the safety of the community from the commission of further crimes by this Defendant. *See* 18 U.S.C. § 3142(e)(3).

The parties dispute the ultimate finding of detention by Magistrate Judge Mitchell and his evaluation of the evidence presented at the detention hearing. (Docket Nos. 25, 29, 29-2, 33, 39). The relevant legal principles on these contested issues follow.

When the presumption of detention arises, the burden shifts to Defendant to produce some credible evidence that he will appear and will not present a threat to the community. *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986). If Defendant makes such a showing, the burden then returns to the Government to demonstrate by clear and convincing evidence that Defendant is a danger to the community and/or by a preponderance of the evidence that Defendant is a flight risk. *See United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986) ("The clear and convincing standard does not even operate until the defendant has come forward with some evidence of lack of dangerousness."). In making its determination of whether there are conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community, the Court must weigh the evidence in light of the factors set forth in 18 U.S.C. § 3142(g), i.e.:

> (1) the nature and circumstances of the offense charged […];
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). Section 3142(e) provides that if a "judicial officer finds that no condition or combination of conditions [of pretrial release] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

After careful consideration of all the evidence of record, and the arguments of counsel in light of these governing legal principles, the Court finds that, on balance, the evidence presented at the detention hearing before Magistrate Judge Mitchell favors the government on the majority of these factors and that the Government has met its burden to demonstrate that pretrial detention is appropriate. Accordingly, the Court affirms the decision of Magistrate Judge Mitchell ordering that Defendant be detained pending trial. The Court now turns to its evaluation of the evidence on the contested legal points.

### A. Nature and Circumstance of Offenses Charged and Weight of Evidence

As to the first and second factors, this case involves very serious charges that Defendant participated in an interstate conspiracy to distribute more than 5 kilograms of cocaine and 1 kilogram of heroin throughout Western Pennsylvania between January of 2013 and December of 2015. (Docket No. 1). He is separately charged with possession with intent to distribute more

than 5 kilograms of cocaine in November of 2015. (*Id.*). He also faces three additional charges arising from the January 14, 2016 incident including: possession with intent to distribute 5 kilograms or more of cocaine; possession with intent to distribute 100 grams or more of heroin; and possession of firearms in furtherance of these drug trafficking offenses. (*Id.*). While the Court recognizes that Defendant is presumed innocent of the charged offenses, *see* 18 U.S.C. 3142(j), the Court finds that the weight of the evidence against Defendant appears strong based on the uncontested evidence proffered by the Government indicating that Defendant:

- purchased 45 kilograms of cocaine from the CI in November of 2015, which he paid for in at least two installments in December of 2015 totaling around $320,000;

- provided an additional $330,000 to the CI in December of 2015 to secure a shipment of 50 kilograms of cocaine in January of 2016;

- participated with the CI in the drug deal involving 50 kilograms of cocaine in the Smallman Street apartment on January 14, 2016, at which time $300,000 was seized from Defendant, along with the two firearms, one of which was in his waistband; and,

- was in the apartment conducting a drug transaction where 10,000 stamp bags of heroin were seized on the same day, albeit in a different room.

(*See* Docket No. 29-2). Certainly, eyewitness testimony from the CI that he or she sold multi-kilogram quantities of cocaine directly to Defendant in exchange for hundreds of thousands of dollars in cash on several occasions may be sufficient to convict him of the possession/distribution charges at Counts 2, 3, and 4. *See United States v. Steptoe*, 126 F. App'x 47, n.1 (3d Cir. 2005) (citing *United States v. Perez*, 280 F.3d 318, 344 (3d Cir. 2002)) ("The testimony of one uncorroborated witness is sufficient to convict."). The December payments to the CI also constitute strong evidence of Defendant's knowing participation in the conspiracy charged at Count 1. *See United States v. Maynard*, 596 F. App'x 56, 59 (3d Cir. 2015). Of

course, the CI's testimony is buttressed by the audio and video recordings that he helped law enforcement acquire, which provide additional support to the conspiracy and distribution charges. *See e.g., United States v. Favato*, 533 F. App'x 127, 131 (3d Cir. 2013) (recorded conversations corroborated testimony of cooperating witness). Further, when law enforcement intervened on January 14, 2016, Defendant was observed by law enforcement agents to be in actual, physical possession of one of the firearms in his waistband. (Docket No. 29-2 at 10-11, 24). He was arguably in constructive possession of a second firearm in the book bag he was carrying and contained the remainder of the $300,000 cash which was to be used to purchase the cocaine. (*Id.*).

In short, there is significant evidence that Defendant was involved in the offenses charged at Counts 1-5 and the weight of such evidence appears strong, favoring pretrial detention. 18 U.S.C. § 3142(g)(1)-(2).

*B. History and Characteristics of Defendant*

The Court next considers Defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" under section 3142(g)(3)(A).

Defendant is 42 years old. (*See Bond Report 3/2/16*). He is a lifelong resident of the Greater Pittsburgh area. (*Id.*). He was recently married to his long-time girlfriend of 13 years. (*Id.*). Defendant and his wife have two minor children that live in the family home to which Defendant hopes to return if granted bail. (*Id.*). Defendant has three other children from prior relationships who do not live with him. (*Id.*). Defendant has no known history of drug or alcohol abuse or significant health problems. (*Id.*).

As to employment, Defendant was working at New Millennium Auto Sales earning around $2,250 per month. (*Bond Report 3/2/16*). His wife is presently on an unspecified leave of absence from her job as a clinical support specialist at a local hospital but was earning approximately $1,900 per month while working. (Docket No. 29 at ¶ 15; *Bond Report 3/2/16*). All told, the household finances demonstrate that they were making a combined salary of around $49,800 annually, against $31,500 in household expenses. (*Bond Report 3/2/16*). Despite this modest household income, Defendant was able to vacation in Miami, Florida in 2015 and travel internationally to Africa in 2015 and Turkey in 2010. (*Id.*). In May of 2015, Defendant was also in possession of expensive Gucci watches along with $20,000 cash when he was stopped at the airport security check point with a firearm in his bag. (Docket No. 29-2 at 24). Defendant then provided nearly $1 million in cash to the CI between December of 2015 and January of 2016. (*Id.* at 6-7, 10-11). In short, before he was indicted, Defendant was living well beyond the means generated by the couple's legitimate employment: possessing designer jewelry; carrying significant amounts of cash; and, taking expensive trips. [4] He was also maintaining both his family residence and an apartment in the Strip District. (*Bond Report 3/2/16*; Docket Nos. 29-2 at 10; 33).

Defendant proffers that Pretrial Services has approved Defendant's wife to act as a third party custodian and, alternatively, his mother.[5] (Docket No. 29). It is well established that the mere fact that a relative or other individual is willing to serve as a third party custodian for a

---

[4]     The Court notes that based on the reported income and expenses, Defendant and his wife would have around $18,300 per year in disposable income and at that level, would have to work for more than 54 years to generate $1,000,000.00 in cash.

[5]     The Court is without much information concerning Defendant's mother, or her Penn Hills residence. (*See* Docket No. 29). If the Court believed that this location was a genuine option as a release plan, it would convene a further hearing on the issue. But, given the state of the record, Defendant has not overcome the presumption of detention and the Government has otherwise presented clear and convincing evidence of Defendant's dangerousness and risk of flight, such that the Court need not have Pretrial Services conduct any further investigation of this residence or hear testimony on this point.

defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case. *See United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582 (W.D. Pa. Apr. 8, 2014) (Conti, C.J.). Here, the Court has concerns about returning Defendant to the family home given the burglary that occurred there in late 2015. (Docket Nos. 33, 39). It is uncontested that the burglars were not apprehended, did not find what they were looking for during the first robbery and both Defendant and his wife believed that they must carry firearms to protect themselves from this type of home invasion. (Docket Nos. 33-2; 39-1). Defendant, obviously, would be prohibited from accessing firearms while on pretrial release. His wife would also be required to forfeit her rights to possess a firearm if Defendant was returned to that residence and she has agreed to do so. (*Bond Report 3/2/16*). As two minor children reside at this home, it is concerning that they may be exposed to potential harm if Defendant is returned to the home and it is unprotected.

Moving on, it is true that Defendant has no prior criminal convictions. However, he was previously charged with firearms and narcotics offenses as a young adult and those charges were apparently dismissed without convictions. (*Bond Report 3/2/16*). He also avoided charges from the incident at the airport where he tried to carry a loaded firearm onto a plane. (Govt. Ex. 13). It would appear that these types of interactions with law enforcement would dissuade a reasonable individual from engaging in criminal activity of the type that is alleged to have occurred in this case. Hence, the lack of criminal convictions does not wholly weigh in Defendant's favor.

Defendant also self-reported to the U.S. District Court upon the return of the Indictment and did not have any reported incidents while he was on bond for around 6 weeks under

supervision of the state court. (Docket Nos. 29, 39). These facts weigh, to some extent, in his favor.

Overall, Defendant has presented "some evidence" of the potential for him to return to stable law-abiding life, if released. *See Carbone*, 793 F.2d at 560. However, while the record shows that Defendant has the support of family and friends, employment and a place to live, such facts are undermined by the evidence of Defendant's living well beyond his means, his involvement in this conduct for a period of 2 years despite the prior arrest record, the circumstances of the home invasion and his planned response thereto. *See* 18 U.S.C. § 3142.

## C. *Nature and Seriousness of Danger to Any Person or the Community if Released*

The fourth and final factor involves consideration of the defendant's risk of non-appearance and the seriousness of potential harm to any persons or the community. 18 U.S.C. § 3142(g). Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs like heroin and cocaine. *See United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("violence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs."); *see United States v. Yarbough*, No. 2:14-CR-270-11, 2014 WL 7343839, at *4 (W.D. Pa. Dec. 23, 2014) (McVerry, J.) ("heroin trafficking represents a substantial danger to the community."). As this Court has previously recognized:

> "Schedule I drugs, such as heroin, have 'a high potential for abuse,' 'no currently accepted medical use in treatment in the United States,' and 'a lack of accepted safety' even 'under medical supervision.'" *Burrage v. United States*, 134 S. Ct. 881, 887, 187 L. Ed. 2d 715 (2014) (quoting 21 U.S.C. § 812(b)(1)). Additionally, the Centers for Disease Control and Prevention have cautioned that the number of heroin-related overdose deaths has quadrupled in the past decade (between 2002 and 2013) and that such statistics demonstrate that heroin abuse has become an epidemic problem at the federal, state and local levels. *See Ctr's*

*for Disease Control & Prevention, "Today's Heroin Epidemic: More people at risk, multiple drugs abused,"* (July 2015), *available at*: http://www.cdc.gov/vitalsigns/pdf/2015-07-vitalsigns.pdf (last visited 8/18/15).

*Atkins*, 2015 WL 4920831 at *7. In addition, distribution of Schedule II controlled substances like cocaine, have a "high potential for abuse," have "a currently accepted medical use in treatment in the United States" with "severe restrictions," but "abuse of the drug or other substances may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2). The amounts of these controlled substances that were allegedly trafficked here, particularly the nearly 100 kilograms of cocaine, far exceeds the 5 kilograms that is needed to trigger the 10 year mandatory minimum penalty that may be applicable. Hence, the high volume trafficking of these particular types of illegal narcotics presents considerable danger to the community.

Of course, the utilization of firearms in furtherance of drug trafficking poses a significant threat of violence. *See e.g., United States v. Gemere Bey*, 2015 WL 7176340, at *4-5 (W.D. Pa. Nov. 13, 2015). While the Court appreciates that the parties have differing views on Defendant's comments to the CI, his statements reveal, at a minimum, that he was not afraid to use his weapon if the need arose and would not back down from a confrontation. (*See* Docket No. 39-1 at 2 ("People already know I carry a gun anyway. So they just not gonna run up and grab me. Ain't nobody gonna want to get close to me cuz I got a gun in my thing. Gun in here…")). He allegedly had one semiautomatic pistol holstered throughout the January 14, 2016 drug transaction with the CI, ready to go if needed. (Docket No. 29-2 at 10-11, 24). A second pistol was located in the book bag and easily accessible to Defendant as he was removing the cash from it and placing it on the bed when law enforcement arrived on the scene. (*Id.*). Yet, neither the Second Amendment nor Defendant's concealed carry permit authorized him to possess a weapon in furtherance of drug trafficking. *See e.g., United States v. Huet*, 665 F.3d 588, 602 (3d

Cir. 2012) (citing *United States v. Potter*, 630 F.3d 1260, 1261 (9th Cir. 2011)) ("Otherwise illegal conduct does not somehow become immunized because possession of a firearm is involved in the offense.").  Further, Defendant's communications reveal that he had considerable angst toward the burglars that broke into his house – whom he did not know – making it reasonable to infer that he has similar angst toward the CI that cooperated against him resulting in this Indictment, his present incarceration and the significant penalties that he faces, if convicted.  *See e.g., Gemere Bey*, 2015 WL 7176340, at \*6 (statements posted on Facebook containing threats toward individual supported finding of dangerousness and pretrial detention).

Many courts, including this one, have recognized that strict conditions of release, including home confinement and electronic monitoring cannot guarantee that a defendant will no longer engage in criminal activity.  *See e.g., Yarbough*, 2014 WL 7343839, at \*4 ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity."); *Atkins*, 2015 WL 4920831 at \*7.  It is also apparent that there is some risk that violence may occur at this particular residence given the prior burglary and Defendant's statements as to same, making his release to this residence inappropriate.  At a minimum, there is a risk that Defendant will attempt to secure a firearm in order to protect his home – despite court conditions prohibiting same.  *See e.g., Huet*, 665 F.3d at 602.

With respect to the risk of non-appearance, Defendant highlights the facts that he was on bond for 6 weeks without incident in the state system and that he voluntarily surrendered to federal authorities to face these charges immediately upon receiving notice of same.  (Docket Nos. 29, 39).  Courts have found that facts underlying a defendant's voluntary surrender to authorities may support positive inferences in a defendant's favor that he is unlikely to flee and will appear when required in accordance with the terms of release.  *See e.g., United States v.*

*Fiandor*, 874 F. Supp. 1358, 1361 (S.D. Fl. Jan. 13, 1995) ("A defendant's voluntary surrender undoubtedly is probative of whether he or she presents a flight risk."); *see also Atkins*, 2015 WL 4920831, at *7. However, it is not conclusive and voluntary surrender, by itself, cannot suggest that "a presumptively dangerous person will not threaten public safety upon his or her temporary return to the street." *Fiandor*, 874 F. Supp. at 1361. In addition, the six weeks that Defendant was on bond in state court must be weighed against the facts that the grand jury found probable cause that he was involved in significant trafficking of very dangerous and illicit controlled substances for the 2 years immediately preceding his release on bond and that nearly $1,000,000.00 was seized by law enforcement as a result of his dealings with the CI.

Beyond these facts, the risk of Defendant's potential to flee from prosecution is heightened due to the substantial penalties he faces if convicted in this case, including mandatory minimum sentences of at least 15 years and up to life imprisonment if he is convicted of any of Counts 1-3, subjecting him to a mandatory penalty of 10 years, along with Count 5 and the mandatory consecutive sentence of 5 years associated therewith. *See e.g., Ewell*, 2013 WL 4479029, at *3 ("The potential for flight from prosecution is now greater as he has been charged with such a serious offense and faces very severe penalties, if convicted."); *United States v. Merlino*, No. CRIM. A. 99-363, 1999 WL 557943, at *6 (E.D. Pa. July 30, 1999) ("the fact that the charges carry a mandatory minimum of 10 years imprisonment with a maximum of life provides the defendant with all the incentive he needs to flee this jurisdiction."); *Gemere Bey*, 2015 WL 7176340, at *6 ("Gemere Bey faces at least 17 years' incarceration, if convicted of both charges, such that there is a potential that he will seek to flee from prosecution, despite his family support and lack of prior instances of flight or failing to appear as required for court."). Again, the record demonstrates that Defendant has ready access to significant amounts of cash

and has traveled internationally in the recent past. Hence, there is record evidence supporting a finding that he is a risk of non-appearance, despite his brief compliance with state bond conditions and voluntary surrender to federal authorities.

Collectively, the facts outlined above present an unacceptable risk of Defendant's non-appearance and/or his engagement in illegal behavior or violence if he is released on bond, even under the most restrictive conditions, including home detention and electronic monitoring. *See* 18 U.S.C. § 3142(g).

### D. Defendant's Arguments Concerning Status of CI

Next, Defendant makes much of the fact that the CI, his source of multi-kilogram shipments of cocaine, is not in custody as supportive of his pursuit of pretrial release on bond and possibly undermines the Government's position that his own distribution activities were dangerous under the Bail Reform Act. (*See* Docket Nos. 29, 39). This Court disagrees on both points.

As this Court previously recognized in *United States v. Telano White*, Crim. No. 14-178, Docket No. 215 at 24-25 (W.D. Pa. Dec. 8, 2014), "the status of the coconspirators as released on bond and/or in pretrial custody does not bear directly on whether this Defendant should be released from custody as the same is not a specific factor under section 3142(g) which must be considered when making an individualized assessment of his eligibility for bail." *Id.* (citing *United States v. Pompei*, No. CR. 98-196, 1998 WL 372650, at *1 (E.D. Pa. May 14, 1998) ("the factors enumerated in [18 U.S.C. § 3142(g)] apply to each defendant individually"); *United States v. Snead*, 2014 WL 4473773, at *4 (D.R.I. Feb. 4, 2014) (court's analysis of § 3142(g) factors "must amount to an individualized bail determination tailored to the facts pertaining to the defendant.")). Rather, the Court must undertake an individualized assessment of the risks

presented by each defendant and those defendants who are not similarly situated are not entitled to the same treatment for bail eligibility as their coconspirators. *Id.* at 25 (quoting *United States v. Stone*, 608 F.3d 939, 946 (6th Cir. 2010)) ("'In cases like this one, involving multiple defendants who are not necessarily similarly situated, the dangerousness inquiry must be an individualized one. Just as at trial, in which courts and juries must resist the urge to find guilt or innocence by association, each defendant is entitled to an individualized determination of bail eligibility.'").

Here, Defendant and the CI are not similarly situated as that individual is actively cooperating with a law enforcement investigation while Defendant was a target of that investigation and is now facing very serious charges as a result of same. *Cf. United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) (at sentencing, codefendants are not similarly situated under § 3553(a)(6) when one cooperates with law enforcement and the other does not). Indeed, the CI has assisted law enforcement in seizing more than $1,000,000 of what appears to be drug proceeds from Defendant, two firearms, and 10,000 stamp bags of heroin. It cannot be credibly argued that removing heroin, cash and firearms from the streets do not further legitimate law enforcement objectives. Of course, had the CI been incarcerated upon the traffic stop in December of 2015, these seizures likely could not have been accomplished as easily. In any event, this Court has not been called upon to review a bond decision by a Magistrate Judge in the CI's case, if there even is a case pending and the decision of when and how to charge the CI remains wholly within the discretion of the Department of Justice and/or state prosecutorial authorities. *See e.g., United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)) ("In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by

statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'"). Therefore, the Court overrules any objection to the pretrial detention of Defendant based on alleged disparate treatment between him and the CI.

   *E.  Overall Weighing of Relevant Factors*

   Based on the above findings, the Court affirms the decision of Magistrate Judge Mitchell ordering pretrial detention in this case. (Docket No. 19). The Court also finds that Defendant has not met his burden to rebut the applicable presumption of detention by presenting some credible evidence that he will appear for all court proceedings and not pose a threat to any persons or the community. *See Carbone*, 793 F.2d at 560. The Court further holds that even if Defendant had met his initial burden, the Government's evidence is sufficient to demonstrate by clear and convincing evidence that Defendant is a danger to the community and by a preponderance of the evidence that he is a flight risk. *See Perry*, 788 F.2d at 115. Accordingly, pretrial detention is appropriately ordered based on this record.

   V.  CONCLUSION

   For the foregoing reasons, the Order of Pretrial Detention issued by Magistrate Judge Mitchell on March 4, 2016 [19] is affirmed, and Defendant's Motion [25] is denied to the extent that he seeks reversal of such Order and release on bail. An appropriate Order follows.

   *s/Nora Barry Fischer*
   Nora Barry Fischer
   U.S. District Judge

Date:  May 3, 2016

cc/ecf:  All counsel of record.

   Michael Oliver c/o Tina Miller, Esquire

   U.S. Probation Office